UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | 1:18-cr-00099-JAW |
| | ) | |
| CARLOS PEMBERTON, | ) | |
| | ) | |
| Defendant | ) | |

## RECOMMENDED DECISION ON DEFENDANT'S AMENDED MOTION TO SUPPRESS

This matter is before the Court on Defendant's amended motion to suppress. (Motion, ECF No. 26.) Following an evidentiary hearing and after consideration of the parties' arguments, I recommend the Court deny the amended motion to suppress.

### PROPOSED FINDINGS OF FACT

Based on the evidence presented at the hearing, I recommend the Court find the following facts:

1. On March 26, 2018, Dolores Acheson asked her brother, Alex Nicholas, the Chief of Police for the Indian Township Police Department, for his assistance in checking on the welfare of one of her granddaughters (the or her granddaughter) at the home of her daughter (Heather Sabattus).

2. A few days prior to March 26, Ms. Sabattus had been arrested on a warrant. Chief Nicholas arrested her.

3. After her arrest, Ms. Sabattus told her mother that Jessica Dana was staying at Ms. Sabattus' home to care for Ms. Sabattus' six children. She asked her mother (Ms.

Acheson) to go to her home to get $5,000 for her bail. Ms. Sabattus told her mother that her boyfriend, whom she called "Pepa," was at the home.[1]

4. When Ms. Acheson called her daughter's home, she spoke with Ms. Dana and could hear children and a man yelling in the background. The next day, Ms. Acheson went to the home to pick up the children. She entered the home, which was a mobile home consisting of two small bedrooms, a bathroom, a living room and kitchen combined, and a "back" or master bedroom. Ms. Dana and all the children were present. Ms. Acheson noticed the master bedroom door was closed. Ms. Acheson took all the children, except the granddaughter, to her home. The granddaughter stayed at the mobile home with Ms. Dana. The granddaughter was fourteen years old.

5. The next day (March 26), Ms. Acheson called the local school to determine whether her granddaughter was in school. Upon learning that her granddaughter was not in school, Ms. Acheson called Chief Nicholas for assistance. Ms. Acheson reported to Chief Nicholas that she was concerned because there was a black male staying in the home with her grandchildren and she had never seen or met him. Based on prior history at her daughter's home and given the amount of money that was evidently available at the home, she was concerned that there was drug activity at the home.

6. On March 26, Ms. Sabattus remained in jail.

---

[1] The boyfriend is referred to in the record as "Pep" or "Pepa."

7. As of March 26, Chief Nicholas knew Ms. Dana to have been part of an investigation related to illegal drugs. He also believed drug activity had been ongoing at Ms. Sabattus' home for two or three years.

8. On March 26, Chief Nicholas was aware that there was an outstanding warrant for Ms. Dana's arrest because she failed to appear in tribal court on a charge of passing a stopped school bus.

9. When Ms. Acheson asked Chief Nicholas for assistance, she asked him to accompany her to Ms. Sabattus' home to check on her granddaughter and to determine the identity of the man who was residing at the home.

10. Because he was concerned that Ms. Dana might not come to the door if he or another officer went to the home in a marked police vehicle, Chief Nicholas traveled to the home with Ms. Acheson in Ms. Acheson's vehicle.

11. Before going to the home, Chief Nicholas was aware a person named "Pepa" was a person believed to be involved in trafficking drugs implicated in a separate overdose case.

12. A confidential informant had also advised Chief Nicholas that Pepa was selling illegal drugs from the home.

13. Chief Nicholas was concerned about the safety in the home given his understanding that a person wanted on a warrant (Ms. Dana) and a person known to be involved in illegal drug activity (Pepa) were reportedly living in the home.

14. Because of his safety concerns, Chief Nicholas arranged for additional police officers (Officers Barnard, McCook and Mitchell) to be nearby when he went to the home with Ms. Acheson.

15. Before Ms. Acheson approached the home, Chief Nicholas told her that after she entered the home, she should signal to him that she was okay and that her granddaughter was there.

16. When Chief Nicholas and Ms. Acheson arrived at the home, Chief Nicholas remained in the vehicle and Ms. Acheson approached the home. Ms. Acheson knocked on the door, the door opened, and Ms. Acheson entered the home. Ms. Dana and a friend of Ms. Sabattus, Heidi Sockabasin, were present. Ms. Acheson went into the first bedroom on the right as she entered the home, and found her granddaughter sleeping. She signaled to Chief Nicholas that she had located her granddaughter. The granddaughter was subsequently removed from the home.

17. As Chief Nicholas observed Ms. Acheson in the home with the door open, he could see Ms. Dana standing in the home. Chief Nicholas then radioed to the other officers, exited his vehicle, entered the home and arrested Ms. Dana, who was in the combined living room/kitchen.

18. When he entered the home, he also observed Heidi Sockabasin in the home. He knew Ms. Sockabasin to have a history of drug involvement. He observed her put an item he described as a "drug purse" in the cushions of the couch on which she was sitting.

19. Officer McCook located the "drug purse." Drug paraphernalia, needles and a package (illegal drugs) were found in the "purse." Ms. Sockabasin claimed ownership of the items. She subsequently (after being removed from the home) told Chief Nicholas that she had obtained the drugs from "Pepa."

20. As Chief Nicholas was arresting Ms. Dana, the other officers (Officers Barnard, McCook and Mitchell) entered the home. Chief Nicholas instructed Officer McCook to remove Ms. Dana from the home and directed Officer Barnard to the master bedroom as he had heard movement from the master bedroom.

21. When he was in the area of the arrest (the combined living room/kitchen) and heard the noise, Chief Nicholas was approximately eight feet from the "back" or master bedroom.

22. After Ms. Dana was removed from the home, Chief Nicholas turned his attention to the master bedroom. Officer Barnard had entered the master bedroom. Defendant was found in the bedroom. Defendant was placed in handcuffs. Chief Nicholas observed drug paraphernalia and some residue. When they did a "pat down" of Defendant, the officers found one pocket of his pants to be bulky. Money was located and removed.

23. When Ms. Dana, Ms. Sockabasin, and Defendant had been secured, based on the information provided by Ms. Sockabasin and the evidence found in the home, law enforcement applied for and obtained a warrant to search the home.

24. Upon execution of the search warrant, law enforcement found heroin packets, marijuana, needles, and some pills.

**DISCUSSION**

Defendant contends law enforcement's initial entry into the home and the search of the home after entering the home were unlawful. Defendant seeks to suppress evidence obtained during the initial search and evidence obtained as the result of the subsequent search conducted pursuant to the search warrant.

**I. Entry into the Home**

"[A]n arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton v. New York*, 445 U.S. 573, 603 (1980); *see also United States v. Hamilton*, 819 F.3d 503, 506 (1st Cir. 2016). Chief Nicholas entered the home after observing Ms. Dana, for whom he had an arrest warrant, in the home. Citing the United States Supreme Court's decision in *Steagald v. United States*, 451 U.S. 204 (1981), Defendant argues the entry was unlawful because Ms. Dana did not reside at the home and, therefore, a search warrant was required to enter the home.[2] In *Steagald*, the Supreme Court reasoned:

---

[2] Defendant also argues in part that the search was unlawful because Chief Nicholas' principal objective when he entered the home was to search for Defendant for whom he did not have an arrest warrant or a search warrant. While Ms. Acheson expressed concern about the person residing in the home and wanted to identify the individual, and while the record demonstrates that Chief Nicholas was interested in identifying the individual and learning more about the individual's activity in the home, Chief Nicholas' subjective intent in entering the home is not relevant to the Fourth Amendment analysis. The First Circuit explained in *United States v. Weems*, 322 F.3d 18 (1st Cir. 2003):

> The focus of [the defendant's] argument to the district court was that the arrest warrant was a "pretext" used by the . . . police to raid a house for which they had no search warrant. The entire premise of the attack is misplaced. The question is not one of pretext, and the subjective intent of the police plays no role in the analysis of a motion to suppress under the Fourth Amendment. *See Whren v. United States*, 517 U.S. 806, 813 (1996). Rather, the

> Because an arrest warrant authorizes the police to deprive a person of his liberty, it necessarily also authorizes a limited invasion of that person's privacy interest when it is necessary to arrest him in his home. This analysis, however, is plainly inapplicable when the police seek to use an arrest warrant as legal authority to enter the home of a third party to conduct a search.

*Steagald*, 451 U.S. at 214 n.7. The Government contends that as the First Circuit confirmed in *United States v. Hamilton*, 819 F.3d 503 (1st Cir. 2016), the entry into a third party's residence with a warrant for the arrest of a suspect "is justified if the police had 'reasonably believed' that (1) the suspect resided at the location and (2) the suspect would be present." *Hamilton*, 819 F. 3d at 506 (quoting *United States v. Graham*, 553 F.3d 6, 12 (1st Cir. 2009)).

Here, Chief Nicholas knew that the home belonged to Ms. Sabattus and that Ms. Sabattus ordinarily lived there with her children. Chief Nicholas had a reliable report that at Ms. Sabattus' request, Ms. Dana was "staying" at the residence to care for Ms. Sabattus' six children while Ms. Sabattus was in jail.

Some courts, including the First Circuit, have considered information that someone was "staying with" or "staying at" a house as evidence that the person was living at the house. *See Graham*, 553 F.3d at 13 (finding relevant a witness's statements that the subject was "staying at" the residence); *United States v. Werra*, 638 F.3d 326, 337 – 38 (1st Cir. 2011) (citing *United States v. Jones*, 523 F.3d 31, 37 (1st Cir. 2008) and *United States v. Pelletier*, 469 F.3d 194, 197, 200-1 (1st Cir. 2006) for the relevance of statements from

---

question is whether the entry and later activities were objectively reasonable under the Fourth Amendment.

*Weems*, 322 F.3d at 23–24.

7

informants that a subject was occupying a particular location, but concluding that was insufficient evidence standing alone); *see also United States v. Lovelock*, 170 F.3d 339, 344 (2d Cir. 1999) (the word "stays" is consistent with the word "resides," and it is reasonable for officers to interpret its use by informants that way). While evidence that a suspect is "staying at" a location can under certain circumstances constitute sufficient grounds to enter with an arrest warrant, where the suspect is merely an overnight guest, entry would likely not be lawful. *See Perez v. Simmons*, 884 F.2d 1136, 1141 (9th Cir. 1988), *amended by*, 900 F.2d 213 (9th Cir. 1990), *order corrected*, 998 F.2d 775 (9th Cir. 1993) (rejecting jury instruction indicating that occasional overnight stays amounted to residency for purposes of entry based on arrest warrant: "The Court made it very clear in *Steagald* that the Fourth Amendment does not allow entry into a third person's home without a search warrant. We would impermissibly diminish the protection offered by *Steagald* were we to hold that, for purposes of the *homeowner's* Fourth Amendment rights, the dwelling is the "home" of whoever happens to be staying there").

In this case, the report that Ms. Dana was staying at the home was supported by the record evidence and the information available to Chief Nicholas at the time of the arrest. First, Chief Nicholas had arrested Ms. Sabattus and knew she was in jail. Second, Ms. Acheson reported to Chief Nicholas that the day before the entry, she went to the home and Ms. Dana was at the home with the children. Third, on the day of the entry, when Chief Nicholas observed Ms. Acheson knock on the front door of the home, the door open, and Ms. Acheson enter the home, he saw Ms. Dana standing in the doorway. Ms. Dana's presence at the home the day before the entry and the day of the entry was consistent with

Chief Nicholas' understanding that at the time, Ms. Dana was living in the home to care for Ms. Sabattus' children while Ms. Sabattus was in jail. Furthermore, the record lacks any evidence that Ms. Sabattus' release from jail was imminent.

Under the circumstances, Chief Nicholas could have reasonably concluded that Ms. Dana was not merely an overnight guest of the home. Rather, the evidence supports the conclusion that Ms. Sabattus entrusted to Ms. Dana the care of the home and her children for an indeterminate time (i.e., for as long as Ms. Sabattus was in jail). Given that Chief Nicholas saw Ms. Dana in the home, therefore, Chief Nicholas had reason to believe that at the time, Ms. Dana was living at the home and that she was, in fact, in the home on March 26. Accordingly, Chief Nicholas' entry into the home was lawful.

## II. Search of the Master Bedroom

Defendant argues that law enforcement had no basis to search the master bedroom of the home, in which bedroom law enforcement located Defendant and found evidence they relied upon to arrest Defendant and obtain a search warrant for the home. The Government contends the search of the bedroom was a permissible "protective sweep."

In *Maryland v. Buie*, 494 U.S. 325, 336 (1990), the Supreme Court authorized warrantless "protective sweeps" in certain situations. "[A]s an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Id.* at 334. "Beyond that, however . . . there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept

harbors an individual posing a danger to those on the arrest scene." *Id.* The level of suspicion required for a protective sweep beyond immediately adjoining spaces is when "the searching officer possessed a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warranted the officer in believing that the area swept harbored an individual posing a danger to the officer or others." *Id.* at 327 (internal quotation marks, citations and modifications omitted). A protective sweep is limited to "a cursory inspection of those spaces where a person may be found" and is permissible only if "[t]he sweep lasts no longer than is necessary" and "no longer than it takes to complete the arrest and depart the premises." *Id.* at 335 – 36.

*Buie* thus authorizes a protective sweep in two instances: (1) a search of the spaces "immediately adjoining the place of arrest from which an attack could be immediately launched;" and (2) where articulable facts and inferences from those facts "would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Buie*, 494 U.S. at 334.

*A. Type 1: "Immediately Adjoining"*

On the record in this case, the exact location of the bedroom relative to the place of the arrest of Ms. Dana is arguably difficult to discern. Given the uncontroverted testimony of Chief Nicholas that when he was in the area of the arrest (e.g., the combined living room/kitchen), he was eight feet from the master bedroom, one can reasonably infer that the master bedroom, described as the back bedroom, was at the end of the mobile home nearest the combined living room/kitchen.

The record is unclear whether there is a hallway between the living room/kitchen and the master bedroom. The existence of a hallway, however, would not necessarily preclude a finding that the bedroom was an immediately adjoining room to the place of arrest. Courts have reached different conclusions as to whether a room off a hallway that is adjacent to the place of arrest constitutes an "immediately adjoining" room. In *United States v. Archibald*, 589 F.3d 289 (6th Cir. 2009), the defendant was arrested in the entryway, with a living room adjoining that entryway, a kitchen adjoining the living room, and an upstairs loft connected to the entryway via a staircase. *Id.* at 293. The Sixth Circuit concluded that "the officers swept not just the room 'immediately adjoining' the doorway, i.e., the living room, but also the kitchen and upstairs bedroom." *Id.* at 298. *See also United States v. Mendoza*, 333 F. Supp. 2d 1155, 1159 (D. Utah 2004) (Officers could sweep "in the spaces immediately adjoining the entryway and living room. However, the bedroom in which the firearms were found was at the end of an adjoining hall, rather than immediately adjacent to the main living area"); *United States v. Rodriguez-Madera*, No. CR 16-023 (PAD), 2017 WL 5713211, at *2 n.4 (D.P.R. Nov. 28, 2017) (while "the living room, dining room, part of the kitchen and an entertainment center were immediately adjoining the entrance door w[h]ere defendant was arrested" the "Defendant's bedroom was not immediately adjoining the place of the arrest" because there was an inner hallway between the entrance door area and the bedrooms); *United States v. Fuentes-Rodriguez*, No. 2:18-CR-182-FtM-29MRM, 2019 WL 448764, at *3 (M.D. Fla. Feb. 5, 2019) (bedrooms down a hallway not immediately adjoining spaces with respect to arrests made in living room); *United States v. Curtis*, 239 F. Supp. 2d 1, 4 (D.D.C. 2002) (only open kitchen, living room

closet and living room itself, where defendant was arrested, were found to be immediately adjoining spaces); *State v. Kruse,* 499 N.W.2d 185, 188-9 (Wis. Ct. App. 1993) (search of a bedroom closet down a hallway and around a corner from living room where arrest occurred not permissible); *State v. Garrett*, 635 N.W.2d 615, 621 (Wis. Ct. App. 2001) (living room closet, down a hallway and around a corner from from bedroom where defendant arrested not an immediately adjoining area). Conversely, in *United States v. Lay*, 182 F.3d 911, 1999 WL 436431 (4th Cir. 1999), the Court found the search of a bedroom in a small apartment that opened into a hallway that opened into the living room, which was the place of arrest, was a permissible *Buie* Type 1 sweep. *Id.* at *2.

Other courts have taken a broader, more functional view of the permissible scope of Type 1 *Buie* sweeps. In *Clark v. Webster*, 384 F. Supp. 2d 371 (D. Me. 2005), in a § 1983 action, this Court considered a search inside a small condominium described as follows: "The living room opened into the kitchen; the closet, bathroom, bedroom and laundry room were all connected to the living room by a short hallway." *Id.* at 382–83. The resident was positioned in the living room. *Id.* at 382. The Court (Hornby, J.) concluded, "It was reasonable for the officers to sweep all the rooms because of the modest size and open layout of the condominium. Anyone hiding in any of the rooms in the condominium could have launched a swift attack on the officers in the living room." *Id.* at 383. *See also United States v. Sunkett*, 95 F. Supp. 2d 1367, 1368 (N.D. Ga. 2000) (recognizing immediate risk of attack from closet of bedroom in small apartment ); *United States v. McLemore,* No. 05-CR-266, 2006 WL 572353, at *6 (E.D. Wis. Mar. 7, 2006) (bedrooms in small apartment all presented risk of immediate attack where separated from living room area of arrest by

12

eight-foot hallway); *United States v. Abdulkadin*, 880 F. Supp. 2d 778, 784–85 (E.D. Mich. 2012) (listing factors to consider in determining whether immediate risk of attack exists, including size of dwelling, its floor plan, distance from room to room, and ease of movement from one space to another; search justified where no more than fifteen feet separated place of arrest and bedroom swept); *State v. Hicks*, 3 So. 3d 539, 546 (La. Ct. App. 2008) (every room in apartment accessible to hallway where arrests occurred and were permissibly searched); *State v. Koziol*, 129 Wash. App. 1050, 2005 WL 2502177, at *3-4 (2005) (10-foot hallway did not exclude bedroom from area "immediately adjoining" living room arrest); *People v. Payton*, No. F038529, 2002 WL 31420810, at *4 (Cal. Ct. App. Oct. 28, 2002) (attack could have been launched from any bedroom and protective sweep of those rooms permissible).

Based on the record in this case, including the uncontroverted evidence that when Chief Nicholas was in the area of the arrest, he was eight feet from the master bedroom, the search of the master bedroom can reasonably be construed as a permissible protective sweep of a room immediately adjoining the place of arrest, regardless of whether there was a short hallway between the living room/kitchen and the master bedroom. As in *Clark*, given the close proximity of the master bedroom to the place of arrest, a person in the bedroom could "launch[] a swift attack on the officers" in the living room/kitchen. *Clark*, 384 F. Supp. 2d at 383. Accordingly, the master or "back" bedroom was an immediately adjoining room to the place of arrest as contemplated by *Buie*. The search of the room, therefore, was lawful.

*B. Type 2: Reasonable Suspicion*

Even if the master bedroom is not considered an immediately adjoining room to the place of arrest, the protective sweep is nevertheless justified because a "reasonably prudent officer" would believe that the master bedroom "harbor[ed] an individual posing a danger to those on the arrest scene." *Buie*, 494 U.S. at 334.

In *United States v. Paradis*, 351 F.3d 21, 29 (1st Cir. 2003), the First Circuit wrote that a sweep is not justified after the arrest of the known suspect if there is "no reason to believe that there might be an individual posing a danger to the officers or others," but a sweep is justified in "a situation in which the police believe that a specific individual other than the arrestee is present and dangerous." *Paradis*, 351 F.3d at 29 n.7.  While the Supreme Court has advised against a categorical conclusion that certain searches are permissible based on the type of case or illegal activity of the suspect, *see Richards v. Wisconsin*, 520 U.S. 385, 388 (1997) ("We disagree with the court's conclusion that the Fourth Amendment permits a blanket exception to the knock-and-announce requirement for this entire category of criminal activity"), the First Circuit has recognized that drug trafficking is "a pattern of criminal conduct rife with deadly weapons." *United States v. Trullo*, 809 F.2d 108, 113 (1st Cir. 1987).[3] The First Circuit has also approved of a

---

[3] Several courts have refused to allow protective sweeps based on the mere fact that police are making a drug-related arrest or because a defendant is suspected of drug trafficking. *United States v. Colbert*, 76 F.3d 773, 778 n.2 (6th Cir. 1996) ("justifying a search because drug related arrests are dangerous 'would permit wholesale abrogation of the Fourth Amendment reasonableness requirement'") (quoting *United States v. Hatcher*, 680 F.2d 438, 444 (6th Cir.1982)); *United States v. Moran Vargas*, 376 F.3d 112, 116 (2d Cir. 2004) (discussing information that defendant was a drug courier and that drug traffickers are frequently armed and dangerous and concluding that "such generalizations, without more, are insufficient to justify a protective sweep"); *United States v. Hauk*, 412 F.3d 1179, 1187 (10th Cir. 2005) ("[W]e decline to endorse the suggestion that the Fourth Amendment accommodates a 'drug house' exception. We note also that, even if 'drug houses' were categorically eligible for protective sweeps, police would require specific,

14

"protective sweep of defendant's residence when officers had evidence suggesting that a drug trafficker may have also lived in the residence." *United States v. Delgado-Perez*, 867 F.3d 244, 253 (1st Cir. 2017) (characterizing *Solis-Alarcon v. United States*, 662 F.3d 577, 581-2 (1st Cir. 2011)).[4]

At the time he directed Officer Barnard to check the master bedroom, Chief Nicholas had more information than simply that a person involved in drug activity might live in the home. Chief Nicholas had reason to believe that (1) Pepa lived at the residence, (2) Pepa was a person of interest for drug trafficking from another overdose case, (3) based

---

articulable facts to support reasonable suspicion that a given building is a 'drug house'"); *State v. Spencer*, 268 Conn. 575, 597 n.15, 848 A.2d 1183, 1196 (2004) ("Although we acknowledge the state's concern that firearms are ubiquitous in the drug trade and drug dealers are often prone to violence, this observation, alone, is not an articulable fact sufficient to support a reasonable belief, as required by *Buie*, that the defendant's apartment harbored a person who posed a danger to the safety of the arresting officers or others on the scene") (internal quotation marks omitted). On the other hand, at least two circuits have allowed Type 2 *Buie* sweeps when there are no articulated facts other than the defendant's arrest for drug trafficking. *United States v. Cash*, 378 F.3d 745, 749 (8th Cir. 2004) ("Since an officer approaching a suspected drug trafficker in the open is justified in conducting a *Terry* stop and frisk out of concern that the suspect may resort to violence to thwart the encounter, it follows that an officer arresting a suspected drug trafficker in one room of a multi-room residence is justified in conducting a *Buie* sweep out of concern that there could be individuals lurking in the other rooms who may resort to violence to thwart the arrest"); *United States v. Maldonado,* 472 F.3d 388, 394 (5th Cir. 2006), *abrogated on other grounds, Kentucky v. King*, 563 U.S. 452 (2011) ("The agents had no specific knowledge that weapons were inside the trailer. However, fear for officer safety may be reasonable during drug arrests, even in the absence of any particularized knowledge of the presence of weapons, because in drug deals it is not uncommon for traffickers to carry weapons") (internal quotations and citations omitted).

[4] The First Circuit has interpreted the reasonable suspicion inquiry from *Terry* and *Michigan v. Long* (from which *Buie* extends) to mean the officer must have a subjective belief that the person was armed and dangerous. *United States v. Lott*, 870 F.2d 778, 783–84 (1st Cir. 1989) ("An officer cannot have a *reasonable* suspicion that a person is armed and dangerous when he in fact has *no* such suspicion"). *Lott*, however, was decided before the Supreme Court upheld a pretextual traffic stop in *Whren*. The First Circuit has since noted the tension between *Lott* and *Whren*, but has never expressly overruled *Lott*. *See United States v. McGregor*, 650 F.3d 813, 821–22 (1st Cir. 2011) ("It is an open question whether *Lott* 's 'actual fear' analysis is consistent with the Supreme Court's later comment in *Whren*"). The First Circuit's subsequent determination in *Weems* that "the subjective intent of the police plays no role in the analysis of a motion to suppress under the Fourth Amendment," *Weems*, 322 F.3d at 23–24, suggests that actual fear is not required to justify a protective sweep for safety reasons.

15

upon information from a confidential informant, Pepa was selling drugs from the residence, (4) the home was known to be the scene of drug activity, (5) an occupant of the home, Ms. Sockabasin, who was known to have been involved in drug activity, was seen attempting to hide a "drug purse" in the couch in the living room, and (6) based on the movement he heard from the bedroom, there was a person in the bedroom.

Under the circumstances, to include the master bedroom in a protective sweep based on a suspicion that the bedroom "harbors an individual posing a danger to those on the arrest scene" was reasonable. *Buie*, 494 U.S. at 334. That is, given Chief Nicholas' knowledge of the drug activity at the home and involving occupants of the home, particularly when Chief Nicholas observed furtive conduct by Ms. Sockabasin that was going to require law enforcement to remain in the home beyond the time of the arrest of Ms. Dana, a protective sweep of a nearby room from which there had been the sound of movement was reasonable. Indeed, the movement could have been related to an attempt to interfere with law enforcement's presence in the home, which attempt could have placed the occupants in the home, including the law enforcement officers, at risk. The situation, therefore, was one "in which [Chief Nicholas reasonably believed] that a specific individual other than the arrestee is present and dangerous." *Paradis*, 351 F.3d at 29 n.7. The search of the master bedroom was thus lawful.

## CONCLUSION

Based on the foregoing analysis, I recommend the Court deny Defendant's Amended Motion to Suppress.[5] (ECF No. 26.)

## **NOTICE**

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 17th day of May, 2019.

---

[5] In his motion, Defendant also referenced a possible *Miranda* violation. The record lacks any evidence that would support a conclusion that law enforcement conducted a custodial interrogation of Defendant without Defendant having the benefit of his *Miranda* rights.