UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | No. 1:18-cr-00099-JAW-1 |
| | ) | |
| CARLOS PEMBERTON | ) | |

**ORDER ON MOTION IN LIMINE**

With trial looming, the Court grants in part and dismisses in part a government motion in limine. The Court grants the part of the motion that bars the defendant from rearguing before the jury the merits of the Court's ruling on a motion to suppress evidence. Otherwise, cognizant of the defendant's rights to due process, the benefit of the Confrontation Clause, and compulsory process, the Court declines to bar the defendant from presenting other defense evidence, such as the complicated motivations of certain witnesses, potential racial animus within the police department, and the relationship between the chief of police and a number of critical witnesses.

**I.  BACKGROUND**

   **A.  Procedural History**

A federal grand jury indicted Carlos Pemberton on July 18, 2018, alleging that he possessed heroin with the intent to distribute it in violation of 21 U.S.C. § 841(a)(1). *Indictment* (ECF No. 2). On October 9, 2019, the United States of America (Government) filed a motion in limine to preclude Mr. Pemberton from rearguing issues that it claims were resolved by a decision on a motion to suppress evidence and from offering irrelevant and confusing evidence. *Gov't's Mot.* in Limine

*to Preclude Defense from Rearguing Suppression Issue During Trial and Offering Irrelevant, Confusing Evid.* (ECF No. 108) (*Gov't's Mot.*). Mr. Pemberton responded on November 6, 2019. *Def.'s Resp. to Gov't's Mot.* in Limine *to Preclude Defense from Rearguing Suppression Issue During Trial and Offering Irrelevant, Confusing Evid.* (ECF No. 122) (*Def.'s Opp'n*). The Government did not file a reply.

B. **Factual Backdrop: The Motion to Suppress Evidence**

1. **Procedural History**

After Mr. Pemberton's indictment, he filed a motion to suppress evidence on October 10, 2018, seeking to suppress all evidence seized during a warrantless search of his residence in alleged violation of his constitutional rights. *Def.'s Mot. to Suppress* (ECF No. 17).[1] Mr. Pemberton filed an amended motion to suppress on November 20, 2019, together with an affidavit from Attorney Brown. *Def.'s Am. Mot. to Suppress* (ECF No. 26); *Aff. of Donald F. Brown* (ECF No. 27). The Government responded on December 21, 2018, and attached four exhibits to its opposition. *Gov't's Obj. to the Def.'s Am. Mot. to Suppress* (ECF No. 33), *id.*, Attachs. 1-4. On February 28, 2019, the Magistrate Judge held a suppression hearing at which three witnesses testified, *Ct. Witness List* (ECF No. 47), and the Magistrate Judge admitted six exhibits into evidence. *Ct. Ex. List* (ECF No. 48). The Magistrate Judge held an oral argument on the motion to suppress on April 12, 2019. *Min. Entry* (ECF No. 54). On May 17, 2018, the Magistrate Judge issued a recommended decision on the amended

---

[1] The Government moved to strike Mr. Pemberton's motion on the ground that it failed to comply with District of Maine Local Rule 147(a) because it failed to provide any case citations and failed to present a statement of facts. *Gov't's Mot. to Strike Def.'s Mot. to Suppress* (ECF No. 20). On December 10, 2018, the Court orally denied the motion to strike. *Order* (ECF No. 32).

2

motion to suppress in which he recommended that the Court deny the motion to suppress. *Recommended Decision on Def.'s Am. Mot. to Suppress* (ECF No. 55). Mr. Pemberton did not object to the Magistrate Judge's recommended decision and on August 27, 2019, the Court affirmed it. *Order Affirming the Recommended Decision of the Magistrate Judge* (ECF No. 68).

### 2. The Recommended Decision: The Facts

To understand the basis of the motion in limine, it is essential to understand the motion to suppress and the recommended decision. According to the recommended decision,[2] the motion to suppress involved the following people, each at so-called Indian Township, in the town of Princeton, Washington County, Maine:

(1) Alex Nicholas: Chief of Police for the Indian Township Police Department, brother of Dolores Acheson, and uncle of Heather Sabattus;

(2) Dolores Acheson: sister of Chief Nicholas, mother of Heather Sabattus, and grandmother to Heather Sabattus' six children;

(3) Jessica Dana: a woman babysitting Heather Sabattus' children at Heather Sabattus' mobile home on the Reservation;

(4) Heather Sabattus: Dolores Acheson's daughter, Chief Nicholas' niece, and owner of the mobile home;

(5) Carlos Pemberton: an African-American male who was staying at Heather Sabattus' mobile home;

---

[2] The Court gained additional information during an evidentiary hearing on Mr. Pemberton's Motion to Reconsider that it held on December 12, 2019. *See Tr. of Proceedings*, *Mot. to Reconsider* (ECF No. 147). The Court added some detail to its recitation from evidence presented at the December hearing.

3

(6) Indian Township Police Officers Barnard, McCook and Mitchell;

(7) Heidi Sockabasin: a friend of Heather Sabattus who was present in the Sabattus mobile home at the time of the police entry and search; and

(8) Nevaeh Dana: Heather Sabattus' daughter and Dolores Acheson's granddaughter who was present at the Sabattus mobile home at the time of the police entry and search.

The events leading to the search and seizure of evidence on March 26, 2018, began a few days before, when Heather Sabattus was arrested on a warrant. Chief Nicholas, Ms. Sabattus' uncle, arrested her, and this arrest left Delores Acheson's six grandchildren in Ms. Sabattus' mobile home without their mother.

On March 24, 2018, Ms. Acheson received a telephone call from her daughter, Heidi Sabattus, who told her that Jessica Dana was staying with the six children at the Sabattus mobile home and asked her to go to the mobile home and obtain $5,000 for cash bail. Ms. Sabattus told Ms. Acheson that her boyfriend, whom she called "Pepa," was at the mobile home. Ms. Acheson called the Sabattus home and spoke with Jessica Dana, but she could hear children and a man yelling in the background. The next day, on March 25, 2018, when she went to the Sabattus home to pick up the children, she noticed that the door to the master bedroom was closed. Ms. Acheson took all the children, except a fourteen-year-old granddaughter, Nevaeh Dana, to her home. Nevaeh stayed at the Sabattus mobile home.

On March 26, 2018, Ms. Acheson contacted the school to determine whether Nevaeh was there. The school representative told her that Nevaeh had not come to

4

school that day.  She then contacted her brother, Chief Nicholas, and asked for his assistance in performing a welfare check on Nevaeh at the Sabattus home.  She told Chief Nicholas that she was concerned that there was a black male staying at the home and she had never seen or met him.  She also told Chief Nicholas that based on prior history and the amount of money at the Sabattus home, she was concerned that there was drug activity at the home.  Chief Nicholas had believed that there had been drug activity in the Sabattus home for two to three years, and he was also aware that there was an outstanding arrest warrant for Jessica Dana because she failed to appear in tribal court on a charge of passing a stopped school bus.  Finally, he was aware that Pepa was suspected of trafficking drugs from the Sabattus home.

Ms. Acheson asked her brother to accompany her to Ms. Sabattus' home to check on Nevaeh and to determine the identity of "Pepa."  Chief Nicholas was concerned that if he arrived in a marked cruiser and approached the front door of the Sabattus mobile home, Jessica Dana might not answer it.  Therefore, he went in Ms. Acheson's car.  He was also concerned about the safety of the Sabattus home because Jessica Dana was wanted on a warrant and Mr. Pemberton, a person reportedly involved in drug trafficking, was reportedly present at the home.  Because of his safety concerns, Chief Nicholas arranged for additional police, Officers Barnard, McCook, and Mitchell, to be nearby when he went with Ms. Acheson to the Sabattus home.  Before they arrived at the Sabattus home and Ms. Acheson approached it, Chief Nicholas told Ms. Acheson that after she entered the home, she should signal to him that she was okay and that Nevaeh was there.

5

When Chief Nicholas and Ms. Acheson arrived at the Sabattus mobile home, Chief Nicholas remained in the vehicle and Ms. Acheson approached the home. Ms. Acheson knocked on the door, the door opened, and she entered. Jessica Dana and Ms. Sockabasin were present. Ms. Acheson went into the first bedroom on the right and found Nevaeh sleeping. She signaled to Chief Nicholas that she had located Nevaeh and then Nevaeh was removed from the home.

Chief Nicholas could see Ms. Acheson in the home with the door open and he could also see Jessica Dana. Chief Nicholas radioed the other officers, left his vehicle, entered the Sabattus home, and arrested Jessica Dana, who was in the combined living room/kitchen. As he entered, he noticed Ms. Sockabasin there. He knew Ms. Sockabasin had a history of drug involvement and he saw her put an item he described as a "drug purse" in the cushions of the coach where she was sitting. Officer McCook located the drug purse and found drug paraphernalia, needles, and illegal drugs in the purse. Ms. Sockabasin claimed ownership of all the items in the purse. After being removed from the Sabattus home, Ms. Sockabasin told Chief Nicholas that she obtained the drugs from "Pepa."

As Chief Nicholas was arresting Jessica Dana, Officers Barnard, McCook, and Mitchell entered the Sabattus mobile home. Chief Nicholas instructed Officer McCook to remove Jessica Dana from the home and directed Officer Barnard to the master bedroom where he had heard movement. When he was in the area of the arrest, the combined living room and kitchen, Chief Nicholas was about eight feet from the back or master bedroom.

6

After Jessica Dana was removed from the Sabattus home, Chief Nicholas turned his attention to the master bedroom. Officer Barnard had already entered the master bedroom and found Mr. Pemberton there. Mr. Pemberton was placed in handcuffs and Chief Nicholas observed drug paraphernalia and some drug residue. When they patted down Mr. Pemberton, the police located and removed money from him.

After Jessica Dana, Ms. Sockabasin, and Mr. Pemberton had been secured, based on the information provided by Ms. Sockabasin and the evidence at the home, the police secured a search warrant. Upon execution of the warrant, the police found heroin packets, marijuana, needles, and some pills inside the mobile home.

### C. The Recommended Decision: The Issues and the Decision

In his motion to suppress, Mr. Pemberton raised two issues: (1) whether the entry into the home was lawful, and (2) whether the search of the master bedroom was lawful. The Magistrate Judge determined that both the entry and the search were lawful and this Court affirmed both determinations.

## II. THE PARTIES' POSITIONS

### A. The Government's Motion

In its motion in limine, the Government moves the Court to bar Mr. Pemberton from "relitigating a suppression motion at trial." *Gov't's Mot.* at 1. It urges the Court to exclude "irrelevant evidence" and issues that "are not pertinent to guilt." *Id.* Specifically, the Government says that the Court should not allow Mr. Pemberton to offer evidence on the following:

(1) the conduct of the police in entering and searching the residence;

(2) the events that brought the police to the residence;

(3) the police officers' use of the phrase "[N-word] on the reservation" to describe Mr. Pemberton;

(4) the suggestion that the police officers are racist against African-Americans generally; and

(5) the suggestion that the police officers harbored racial animus against Mr. Pemberton because he is black.

*See id.* at 2-3.

In support of its position, the Government notes that legal determinations on a motion to suppress are the province of the court and should be raised pretrial, as was done in this case. *Id.* at 4. The Government seeks to prevent the defense from arguing that the entry and search were illegal here because such argument would confuse the jury by introducing issues of law properly determined by the Court and cause unfair bias against the Government. *Id.* at 7-8.

### B. Carlos Pemberton's Response

In his response, Mr. Pemberton states that he does not intend to relitigate the suppression issue at trial. *Def.'s Opp'n* at 1. He does intend, subject to the Court's rulings, to present "issues that are not pertinent to guilt but, in fact, may be pertinent to reasonable doubt." *Id.* Mr. Pemberton intends to present evidence about the events that led up to the entry into the Sabattus home and additional witnesses who may present testimony that contradicts some of the testimony in this case. *Id.* at 2.

Mr. Pemberton stressed that he would not introduce evidence of the use of the "N-word" on the reservation unless he had a "good-faith belief" that it is "appropriate with regard to the testimony or conduct of police officers or anyone else involved in this case." *Id.* Mr. Pemberton acknowledges that it is the role of the judge to rule on matters of law and represented that he does not intend to urge jury nullification. *Id.* at 3.

## III. DISCUSSION

Given the amorphous state of the record, the Court declines to issue the pretrial ruling the Government requests because the evidence is simply too undeveloped in the parties' submissions to allow the Court to issue a definitive pretrial ruling. Even so, to assist the parties, the Court makes some observations.

In broad strokes, the parties agree that it is the province of the Court, not the jury, to rule on issues of law and that Mr. Pemberton may not ask the jury to conclude that the Government has not proven the case against him because the entry into the Sabattus home and the search of the master bedroom were illegal. This rule is basic and does not appear to be a matter of controversy between the Government and Mr. Pemberton.

By contrast, the Court views the evidence of what led to the entry into the home and the search of the bedroom, which in turn led to the search of Mr. Pemberton, as presenting an unusual backdrop. Reading between the defense lines, the Court assumes that the defense theory may run as follows:

(1) Heather Sabattus and Mr. Pemberton were in a romantic relationship;

9

(2) Heather Sabattus' mother, Dolores Acheson, disapproved of the relationship because Mr. Pemberton is African-American, and her disapproval was exacerbated because six of her grandchildren were living with Mr. Pemberton and Ms. Sabattus in Ms. Sabattus' mobile home;

(3) Ms. Acheson used Ms. Sabattus' absence from the mobile home to gain physical custody of her grandchildren, remove them from her daughter's mobile home and take them away from Mr. Pemberton;

(4) Ms. Acheson used her sisterly influence with her brother, the local Chief of Police, to enter the Sabattus home to help her secure the grandchildren;

(5) Chief Nicholas used his sister to gain admission into the Sabattus home;

(6) the police, including Chief Nicholas or others at Chief Nicholas' behest, set up Mr. Pemberton by framing him for drug trafficking to gratify Chief Nicholas' sister by arresting Mr. Pemberton, charging him with a crime he did not commit, and thereby removing him for an extended period from Ms. Sabattus' and her children's lives; and

(7) members of the police force of the Indian Township are prejudiced against African-Americans so that they willingly joined Chief Nicholas' and his sister's plot to rid the Indian Township of Mr. Pemberton.

As the Government alone bears the burden of proof, a defendant is not usually obligated to show his defense hand before trial. With that understood, if the Court correctly envisions the defense theory of the case, it will not forbid Mr. Pemberton from presenting this evidence. None of this evidence attacks the Court's order on the

10

motion to suppress. Mr. Pemberton is not claiming that the entry or the search was illegal. He is asserting that the jury should consider not the legality but the motivation of the officers who performed the entry and search and the potentially complicated motivations of the others, including Ms. Acheson.

The rubric that the government "is generally 'entitled to prove its case by evidence of its own choice,'" *United States v. Kilmartin*, No. 18-1513, 2019 U.S. App. LEXIS 36292, at *34 (1st Cir. Dec. 6, 2019) (quoting *Old Chief v. United States*, 519 U.S. 172 (1997)), is all the more true when applied to a defendant. "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Yacouba-Issa v. Calis*, No. 16-cv-12124-ADB, 2019 U.S. Dist. LEXIS 49305, at *23-24 (D. Mass. Mar. 25, 2019) (quoting *Clark v. Arizona*, 548 U.S. 735, 789 (2006) (quoting *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006))). However, "[a] defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions." *Id.* at *24 (alteration in original) (quoting *United States v. Scheffer*, 523 U.S. 303, 308 (1998)).

Even so, the evidentiary calculus is different in a criminal case when a defendant, not the government, is seeking to admit evidence because a defendant, not the government, has the constitutional right of confrontation. U.S. CONST. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . .."). The Confrontation Clause "commands, not

11

that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *Haidak v. Univ. of Mass.-Amherst*, 933 F.3d 56, 68 (1st Cir. 2019) (quoting *Crawford v. Washington*, 541 U.S. 36, 61 (2004)). Thus, "a defendant's right to elicit exculpatory defense evidence through cross-examination falls within the ambit of this longstanding right." *Brown v. Ruane*, 630 F.3d 62, 72 (1st Cir. 2011).

Federal Rule of Evidence 403 obviously applies to the defendant as well as the government and, in this case, the Court will act to enforce Rule 403 to avoid the suggestion to the jury that it should decide the case on "an improper basis, commonly, though not necessarily, an emotional one." *United States v. Vázquez-Soto*, 939 F.3d 365, 375 (1st Cir. 2019) (quoting *Old Chief*, 519 U.S. at 180 (quoting FED. R. EVID. 403, advisory committee's note to 1972 proposed rules)). "Even a generally defensible rule of evidence may be applied so as to produce an unconstitutional infringement." *Brown*, 630 F.3d at 72. One measure is whether the defendant was allowed "a meaningful opportunity to present a complete defense." *Id.* (citing *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973)).

The Court's view of the issue of potential racial bias in this case may assist the parties. Typically, race is not relevant to a criminal prosecution and its introduction into a drug trafficking trial would violate both Federal Rule of Evidence 402 and Rule 403. However, here, it is Mr. Pemberton who wishes to introduce the evidence of racial bias to undercut the credibility of the police officers who investigated the case. Assuming Mr. Pemberton presents a proper foundation, the Court would likely view

such evidence, presented through cross-examination, to be admissible. The suggestion that unnamed people within Indian Township are biased against African-Americans and commonly use the N-word is another matter and the Court views that evidence as having so little relevance and so great a prejudicial impact to likely warrant its exclusion.

With all these issues, it will be appropriate for the defense to approach the bench to alert the Court that one of these contentious evidentiary issues is about to come up at trial. As all trials take on a life of their own, it may be that the pretrial controversy has dissipated by the actual presentation of witness testimony. It may be that the Court orders a brief recess so that the witness may be questioned outside the presence of the jury. It may be that what seemed clearly inadmissible pretrial is clearly admissible at trial or vice versa.

## IV. CONCLUSION

The Court GRANTS in part and DISMISSES without prejudice in part the Government's Motion in Limine to Preclude Defense from Rearguing Suppression Issue During Trial and Offering Irrelevant, Confusing Evidence (ECF No. 108). Based on Mr. Pemberton's agreement, the Court grants that portion of the motion that requests he be barred from rearguing before the jury the legal merits of the ruling on the motion to suppress. Otherwise, the Court dismisses the motion without prejudice, leaving the remaining issues for trial.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 2nd day of January, 2020